## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **CYNTHIA B.,**[1] | ) | |
| | ) | **No. 20 CV 428** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **KILOLO KIJAKAZI, Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | **November 8, 2022** |
| Defendant. | ) | |

### MEMORANDUM OPINION and ORDER

Cynthia B. seeks supplemental security income ("SSI") asserting that she is disabled by depression, panic disorder, degenerative disc disease of the lumbar spine, degenerative joint disease of the right shoulder, obesity, and lymphedema of the right lower extremity. Before the court are the parties' cross motions for summary judgment. For the following reasons, Cynthia's motion is denied, and the government's is granted:

### Procedural History

Cynthia filed her application for SSI benefits in November 2016 alleging that she has been disabled since January 2013. (Administrative Record ("A.R.") 15, 258-63.) Her application was denied initially and upon reconsideration. (Id. at 15, 125-36, 138-51.) She sought and was granted a hearing before an Administrative Law Judge ("ALJ"). (Id. at 15, 200-02, 246-47.) At the October 2018 hearing, at which

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect her privacy to the extent possible.

Cynthia appeared with her case worker, attorney, and a vocational expert ("VE"), Cynthia changed her disability onset date from January 2013 to November 2016. (Id. at 15, 41-91.) The ALJ ruled in February 2019 that Cynthia was not disabled. (Id. at 15-35.) The Appeals Council denied Cynthia's request for review, (id. at 1-5), making the ALJ's decision the final decision of the Commissioner, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Cynthia then filed this lawsuit seeking judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 28).

## Facts

Cynthia completed her GED in 1998 and worked as a bookkeeper, babysitter, and then as a teller at a credit union until 2013, when she said she was fired because of her impairments. (A.R. 52-53, 268-69, 278, 295, 608, 660; see also id. at 312 (stating in December 2016 function report, "[G]ot fired by my boss because of my conditions. Didn't always see eye to eye.").) Cynthia alleges that she has been unable to work since then because of depression, panic disorder (triggering irritable bowel syndrome ("IBS") symptoms), and difficulty sitting, standing, walking, understanding, remembering, and concentrating. (Id. at 25, 52-54, 306-12.) She submitted documentary and testimonial evidence to support her claim.

### A.    Medical Evidence

Cynthia underwent a mental health assessment in September 2016 and reported symptoms related to depression and anxiety. (A.R. 652-81.) She also disclosed that "her family home was being foreclosed." (Id. at 667.) Her appearance

suggested she was "[p]hysically disabled," but she exhibited appropriate attention, normal affect and perceptions, logical and coherent thought processes, good judgment and insight, intact memory, and no acute risk factors. (Id. at 668-71.) The social worker who evaluated Cynthia diagnosed her with persistent depressive disorder with anxious distress and assigned her a Global Assessment of Functioning ("GAF") score of 47, indicating serious symptoms.[2] (Id. at 681.) The social worker also recommended that Cynthia participate in a transitional living program ("TLP") "to develop social skills, coping skills, and [activities of daily living]." (Id. at 678.)

About two weeks later, Dr. Thomas Lee conducted a psychiatric evaluation of Cynthia. (Id. at 608-11.) He noted that Cynthia had been living with her mother, but when her mother died in 2015, she became homeless after the family home went into foreclosure. (Id. at 608.) Dr. Lee noted Cynthia's reports of frequent crying but no suicidal thoughts, paranoia, or psychotic symptoms. (Id.) Cynthia informed Dr. Lee that she had seen a psychiatrist 15 years earlier and was taking Fluoxetine, Lorazepam, and Bupropion. (Id.) On examination Dr. Lee found normal attention, mood, speech, affect, orientation, thought process, thought content, and memory. (Id. at 609.) He opined that she had fair judgment and deficits of anxiety and depression. (Id. at 609-10.) He listed her diagnoses as major depression (recurrent) and panic disorder without agoraphobia and assigned her a GAF score of 50. (Id. at 610.) He

---

[2] GAF is "no longer recognized in the American Psychiatric Association's DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS" but previously was used in disability proceedings. *See Brinley v. Berryhill*, 732 Fed. Appx. 461, 463 (7th Cir. 2018).

recommended that she continue her medications and enter transitional living, with individual and group therapy, case management and crisis intervention, medication management, and psychiatric review every two to six weeks. (Id. at 611.)

During a consultative examination a few months later in January 2017, the examiner observed that Cynthia did not appear to be depressed or anxious but that she had difficulty interpreting abstract expressions. (Id. at 644-45.) Cynthia was noted to be "oriented to person, place and time" and to have "normal range of reasoning and concentration to the task at hand." (Id. at 644.) The examiner opined, however, that Cynthia likely could not handle funds. (Id.) As for physical impairments, the examiner indicated that Cynthia suffers from morbid obesity and spinal stenosis with neuropathy in the legs, among other conditions. (Id. at 644-45.)

In September 2018 Cynthia underwent a comprehensive mental health assessment and was noted to have achieved "maximum progress within her treatment with managing her [medications] and independently maintaining [activities of daily living]." (Id. at 886-915; see also id. at 886-88 (noting that Cynthia continued to show signs of depression and anxiety), 890 (noting that Cynthia "significantly improved with treatment in TLP").)

## B.    Hearing Testimony

Cynthia testified that she struggles with depression, IBS, panic, chronic pain, and concentration. (A.R. 52-53.) Although she worked for a credit union for several years, she said she was fired in 2013 because she made "too many mistakes" and had to take too many restroom breaks. (Id. at 53; see also id. at 312 (noting in function

report that she has "fear of not being near a bathroom because of incontinence").) She said it is "hard for [her] to function in a structured setting" or around other people. (Id.)

Cynthia lived in her family home, and after her mother died in 2015, she said she moved to a two-year TLP because she was having difficulty remembering information and was anxious. (Id. at 54, 60, 67.) TLP staff scheduled appointments for her, monitored her medication, and performed safety checks. (Id. at 60-61.) The TLP provided Cynthia with 12 hours of structure each day, filled with trips, group and individual therapy, and other activities. (Id. at 59-60.) Cynthia said she lived with a roommate without issues, but sometimes isolated herself and did not participate in meetings or activities because she wanted alone time or was experiencing IBS symptoms. (Id. at 59-63, 70.)

Cynthia cried while testifying, explaining that her brother died a week before the hearing. (Id. at 58.) She said he too had suffered from lifelong depression. (Id.) She has low energy, struggles to get out of bed, feels drained, and has difficulty concentrating, retaining information, and sleeping. (Id. at 59, 68.) Cynthia has been diagnosed with panic disorder and depressive disorder, which causes her to feel "[v]ery low, low self-esteem" and "hopeless[]." (Id. at 57.)

Cynthia testified that she also has difficulty walking and has used a cane for mobility and balance for about five years because of radiating pain from spinal stenosis. (Id. at 55.) She can stand for only about 10 to 15 minutes at a time. (Id.) She said she has carpal tunnel syndrome but has not received treatment for it because

of insurance issues. (Id. at 55-56.) Cynthia has a driver's license but does not drive and has difficulty using public transportation because she feels "nervous[], very panicky, [and] . . . very stressed" around groups of people and without a restroom nearby. (Id. at 56-57.)

Cynthia's TLP case worker testified that she had been working with Cynthia one to two times a week for about three months. (Id. at 74-75.) The case worker said that Cynthia met the necessary goals of the program, but Cynthia's anxiety made it difficult for her to participate in a group that had many participants (e.g., 10 members). (Id. at 76-77.) As a result, the case worker moved Cynthia to a "lower populated" group, and this helped her. (Id.)

The ALJ posed hypotheticals to the VE regarding whether someone with a specific residual functional capacity ("RFC") and Cynthia's age, education, and past work could perform work in the national economy. (Id. at 82-86.) One hypothetical concerned an individual with an RFC for sedentary work and specific limitations, including no climbing of ladders, ropes, or scaffolds and no more than occasional climbing of ramps and stairs, balancing, stooping, crouching, kneeling, crawling, bending, twisting, or overhead reaching with the right upper extremity. (Id. at 82-83.) The individual should avoid concentrated exposure to work hazards, such as unprotected heights and dangerous moving machinery, and be permitted to stand for 1 to 2 minutes after sitting for 45 minutes and use a cane as needed to get to and from her workstation. (Id. at 82-83.) The individual should be limited to understanding, remembering, and carrying out only simple, routine tasks, performing the same tasks

without strict quotas or public contact, and interacting with coworkers and supervisors only occasionally. (Id. at 83.) The VE testified that a person with such an RFC could perform jobs in significant numbers in the national economy, such as addresser, cutter and paster, and stuffer. (Id.)

A second hypothetical included the added limitation that the individual should be limited to frequent reaching forward and laterally with the right upper extremity. (Id. at 84.) The VE responded that "[a]ll positions could still be performed, [with] no reduction in numbers." (Id.) However, if the individual is off task more than 15% of the time or needs to take breaks for 10 to 20 minutes at a time on a regular basis, no work would be available. (Id. at 85-86.)

## C.    The ALJ's Decision

The ALJ followed the standard five-step evaluation process, and at step one determined that Cynthia had not engaged in substantial gainful activity since the application date, November 18, 2016. (A.R. 17.) At step two the ALJ found that Cynthia suffers from severe impairments of depression, panic disorder, degenerative disc disease of the lumbar spine, degenerative joint disease of the right shoulder, obesity, and lymphedema of the right lower extremity. (Id. at 17-18.) She also suffers from diabetes, peripheral neuropathy, hypertension, hyperlipidemia, hypothyroidism, and GERD, although the ALJ concluded that these impairments were stable or not medically determinable. (Id. at 18-20.)

At step three the ALJ determined that Cynthia's impairments were not of listings-level severity. (Id. at 20-23.) The ALJ considered the "paragraph B" criteria

and found that Cynthia had a mild limitation in understanding, remembering, or applying information and moderate limitations in interacting with others, adapting or managing oneself, and concentrating, persisting, or maintaining pace ("CPP"). (Id. at 22.) Because Cynthia did not suffer marked or extreme limitations in at least two of these areas, the paragraph B criteria were not satisfied. (Id.) The ALJ also considered the "paragraph C" criteria and likewise found the requirements were not met. (Id. at 22-23.)

Before turning to step four, the ALJ found that Cynthia has the RFC to perform sedentary work with the following limitations: no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, crouching, kneeling, crawling, bending, twisting, and overhead reaching with the right upper extremity; and frequent reaching forward and laterally with the right upper extremity. (Id. at 23-24.) She should avoid concentrated exposure to work hazards (e.g., unprotected heights and dangerous moving machinery) and be permitted to stand for 1 to 2 minutes after sitting for 45 minutes and use a cane to get to and from her workstation. (Id.) The ALJ also limited Cynthia to understanding, remembering, and carrying out only simple, routine tasks, performing the same tasks without strict quotas or public contact, and occasionally interacting with coworkers and supervisors. (Id. at 24.) The ALJ concluded at step four that Cynthia had no past relevant work, but because a person with her RFC could perform jobs that exist in significant numbers in the national economy, the ALJ concluded that Cynthia was not disabled. (Id. at 33-34.)

## Standard of Review

When reviewing the ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and whether the decision has the support of substantial evidence. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This is a deferential standard that precludes the court from reweighing the evidence or substituting its judgment for that of the ALJ's, allowing reversal "only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted); *see also Hahn v. Kijakazi*, No. 22-1106, 2022 WL 6628832, at *3 (7th Cir. Oct. 11, 2022) ("In examining the ALJ's decision we may 'not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's so long as substantial evidence supports it.'" (citation omitted)). "Even if reasonable minds could disagree on whether a claimant is disabled based on the record evidence, a reviewing court must affirm the Commissioner's decision to deny benefits if the decision is adequately supported." *Hahn*, 2022 WL 6628832, at *3 (citation omitted).

Cynthia asserts that a more "critical[] review" of the ALJ's decision is necessary "to ensure that the ALJ has built an 'accurate and logical bridge from the evidence to his conclusion.'" (R. 18, Pl.'s Br. at 8-9 (citations omitted); see also R. 26, Pl.'s Reply at 1.) While the Seventh Circuit endorses a "very deferential" standard of

review—in which the court's "role is extremely limited," *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (citations omitted), Cynthia is correct that in this Circuit the ALJ must "provide a 'logical bridge' between the evidence and his conclusions," *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021). Put another way, the ALJ's "analysis must say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations." *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021).

Some have cast doubt on the applicability of the logical bridge provision in a landscape shaped by the substantial evidence standard. Indeed, one Seventh Circuit panel has explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 Fed. Appx. 973, 977 (7th Cir. 2021) (citing *Biestek*, 139 S. Ct. at 1152); *see also Dwayne E. v. Saul*, No. 20 CV 4745300, 2021 WL 4745300, at *4 (N.D. Ill. Oct. 12, 2021) (noting that, "[i]n this Court's view, the logical bridge provision has always been descriptive and never a standard of review on its own"). More recently, in the Seventh Circuit's decision in *Jarnutowski*, 48 F.4th 769, two members of the panel deciding the matter relied on the logical bridge provision to find that the ALJ did not adequately explain her reasoning, while the third member dissented because he found that the ALJ had done so. The dissenting member remarked, "[c]onsidering the ALJ's entire opinion, our very deferential review, and keeping in mind that the burden of proof remains on the claimant when the ALJ determines the RFC, the majority requires a specificity and explanation beyond what the regulations and case

law require[]." *Id.* at 777. Following the *Jarnutowski* ruling, at least one court has reflected on the "subjectiv[ity]"—and corresponding "lack of predictability"—that the logical bridge provision carries with it. *Leida G. v. Kijakazi*, No. 18 CV 6129, 2022 WL 4367171, at *3 & n.4 (N.D. Ill. Sept. 21, 2022).

Regardless, the Seventh Circuit has reaffirmed that the ALJ must meet the logical bridge requirement to satisfy the substantial evidence standard. *See Jarnutowski*, 48 F.4th at 773; *Wright v. Kijakazi*, No. 20-2715, 2021 WL 3832347, at *5 (7th Cir. Aug. 27, 2021) ("[W]e will not 'nitpick[]' the ALJ's decision, but rather give the opinion a 'commonsensical reading,' focusing on whether the ALJ built a 'logical bridge from the evidence to his conclusion.'" (citation omitted)). Accordingly, this court assesses whether the ALJ's analysis meets the longstanding logical bridge requirement when applying the substantial evidence standard.

## Analysis

Cynthia claims the ALJ erred by: (1) finding at step three that Cynthia's mental impairments did not satisfy listings 12.04 or 12.06; (2) rejecting treating source opinions; and (3) failing to account for her non-exertional limitations in her RFC. (R. 18, Pl.'s Br.) The government responds that the ALJ supported her decision with substantial evidence by repeatedly pointing to Cynthia's treatment records. (R. 24, Govt.'s Resp.)

## A.    Step Three

Cynthia challenges the ALJ's step-three finding that her mental impairments did not meet or medically equal listings 12.04 (depressive, bipolar, and related

disorders) or 12.06 (anxiety and obsessive-compulsive disorders). (R. 18, Pl.'s Br. at 9-13; A.R. 21.) At step three the Social Security Administration ("SSA") "compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations," which are also known as "the listings." *Victoria R. v. Kijakazi*, No. 20 CV 4444, 2022 WL 3543231, at *2 (N.D. Ill. Aug. 18, 2022). Certain criteria described in the regulations must be satisfied to meet or medically equal a listing. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The claimant alleging a listings-level impairment bears the burden of demonstrating that she satisfies the criteria of the applicable listing. *See id*. §§ 404.1509, 404.1520(d), 404.1526; *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). The court first examines the ALJ's application of the paragraph B criteria.

The court finds no error in the ALJ's analysis of the paragraph B criteria. The ALJ considered the criteria as required for listings 12.04 and 12.06 and found that Cynthia's mental impairments did not meet them because she did not suffer at least one extreme or two marked limitations. (A.R. 21-23.) For understanding, remembering, or applying information, the ALJ assessed only a mild limitation—citing records showing Cynthia independently managed her medication and had intact memory, no learning barriers, and average intellectual ability. (Id. at 21 (citing, e.g., id. at 670, 676, 684).)

The ALJ assessed moderate limitations in the remaining functional areas. With respect to interacting with others, Cynthia reported anxiety and panic symptoms, but the ALJ noted that treatment records show she interacted well with

siblings, a neighbor, friends, a roommate, and TLP staff and peers. (Id. at 22 (citing id. at 684 (categorizing Cynthia's difficulty communicating with others as "moderate impairment"), 695 (noting Cynthia "appears to display appropriate social interactions while in groups"), 901-02 (noting Cynthia's report that her relationships with siblings are "good" and "supportive" and her neighbor is "like a second mom"), 1034 (reporting Cynthia was "communicative with staff and peers and appeared less anxious and isolative during group"); but see id. at 76-77 (testifying that Cynthia's anxiety made it difficult for her to participate in a large group)).) As for CPP limitations, the ALJ determined there were "no ongoing issues" mentioned in treatment records—and evaluations from October 2016 to September 2018 reflect a normal level of concentration and attention. (Id. (citing e.g., id. at 613, 617, 714, 720, 732, 736, 740, 1111, 1202, 1273, 1313).) The ALJ acknowledged, however, that Cynthia's depression and anxiety could "possibly" cause attention issues. (Id.) Finally, for adapting and managing oneself, the ALJ assessed a moderate limitation based on records showing that Cynthia did not need special reminders for daily care and was "generally independent" in her daily activities, even though she lived in a highly structured TLP environment. (Id. (citing id. at 1016 (noting Cynthia reported she was "making healthy choices, budgeting, laundry, hygiene"), 1094 (noting Cynthia reported "steady set" of activities of daily living and that she was "doing well" in this area)).) The ALJ supported her paragraph B analysis with substantial evidence showing that despite the severity of Cynthia's impairments, they were not severe enough to establish marked limitations.

Cynthia nevertheless argues that the ALJ engaged in a "misleading" assessment of the paragraph B criteria by cherry picking information that supported her analysis. (R. 18, Pl.'s Br. at 9-10.) To demonstrate that an ALJ's step-three finding lacks the support of substantial evidence, a claimant "must identify record evidence that was misstated or ignored, and that could support a finding that claimant met or equaled the criteria." *Robert S. v. Kijakazi*, No. 20 CV 2235, 2021 WL 5979361, at *6 (S.D. Ind. Dec. 16, 2021). The evidence Cynthia cites fails to satisfy this standard. To be sure, Cynthia contends that the ALJ "falsely asserted that from the fall of 2016 through September 2018, [Cynthia] had normal concentration and attention." (R. 18, Pl.'s Br. at 10.) But the evidence belies Cynthia's argument. As the government correctly points out, the ALJ cited many treatment records supporting this statement. (R. 24, Govt.'s Mem. at 6 (citing A.R. 22).)

Cynthia also cites a GAF score of 47 from her September 2016 mental evaluation as evidence of a serious impairment. (R. 18, Pl.'s Br. at 10.) But the ALJ assigned "little weight" to the GAF scores in her analysis because the scores were based on "subjective reports" and typically were assessed during periods of mental symptom exacerbation, rendering them "inherently unreliable" and "no longer use[d]." (A.R. 33.) The ALJ also observed that Cynthia's GAF scores generally ranged from 51 to 55, reflecting "moderate symptoms and limitations," even though "mental

status examinations usually showed mild to moderate objective findings."[3]  (Id. (citing id. at 610 (Sept. 2016 GAF score of 50; noting high score of 60 within past year), 618 (Oct. 2016 GAF score of 55), 741 (May 2017 GAF score of 55), 935 (March 2018 GAF score of 51), 1011 (Jan. 2018 GAF score of 55), 1112 (April 2018 GAF score of 55), 1203 (June 2018 GAF score of 55)).)  Consistent with the general range of GAF scores, the ALJ assessed moderate limitations in three of four functional areas.  (Id. at 21-22; see also id. at 682-98 (identifying Cynthia's deficits and classifying them as "moderate[]").)  As such, Cynthia's arguments fall short of demonstrating that her mental impairments satisfied the paragraph B criteria.  *Ribaudo*, 458 F.3d at 583.

The ALJ next considered the paragraph C criteria and likewise found they were not met.  (A.R. 22-23.)  Under paragraph C, a claimant alleging a mental disorder must show her mental impairment is "serious and persistent," as demonstrated by "a medically documented history of the disorder over a period of at least [two] years," and evidence of both:

> (1) [m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder . . .; *and*
>
> (2) [m]arginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life . . . .

---

[3] "GAF scores of 51-60 indicate moderate symptoms or limitations in social, occupational, or school function."  *Felts v. Saul*, 797 Fed. Appx. 266, 269 n.1 (7th Cir. 2019).

20 C.F.R. Pt. 404, Subpt. P, App. 1 (emphasis in original); *Victoria R.*, 2022 WL 3543231, at *11. The ALJ explained that although a June 2015 depression screening showed "moderate depression," (A.R. 23 (citing id. at 380)), other screenings performed that month and in February, March, and May 2016 were negative for depression, (id. (citing id. at 388, 459, 465, 467, 474, 478, 484, 486)). And despite Cynthia's participation in the TLP for more than two years, the ALJ emphasized that Cynthia "only entered the [TLP] in September 2016 following the loss of her family home due to foreclosure and upon the suggestion of a social worker"—circumstances that the ALJ said were "not necessarily due to signs, symptoms, or exacerbation of her mental disorder." (Id.)

Even if Cynthia could satisfy the first prong of the paragraph C criteria, the ALJ found Cynthia failed to show that "despite diminished symptoms and signs, [she] achieved marginal adjustment." (Id.) The ALJ observed that the objective evidence, including psychiatric evaluations and treatment records, revealed no "deterioration in functioning," no changes in medication, and no increase in or emergent need for psychiatric visits. (Id.) She noted that Cynthia's treating psychiatrist recorded only mild depression in June 2018, (id. (citing id. at 1201)), and minimal or no symptoms in July, August, and September 2018, (id. (citing id. at 1234, 1272, 1312)). The ALJ also cited records showing that Cynthia had "significantly improved in treatment" at the TLP and achieved "maximum progress." (Id. (citing id. at 890 (noting Cynthia "has been able to successfully manage her [symptoms] and take her medication independently" and has been "successful in gaining the necessary skill sets to actively

manage [symptoms] and complete [activities of daily living] independently"), 912 (noting Cynthia "has made maximum progress in the last year in her treatment")).). The ALJ reasoned that this evidence demonstrated improvement, not an exacerbation of symptoms or deterioration in functioning. (Id.) Additionally, at the time of the hearing Cynthia was preparing to move out of the TLP, signifying an ability to adapt, according to the ALJ. (Id.)

Cynthia argues that the ALJ engaged in a "perfunctory" and "egregious" assessment of the paragraph C criteria, rendering her step-three finding unsupported by substantial evidence. (R. 18, Pl.'s Br. at 10; R. 26, Pl.'s Reply at 2.) She says she satisfies the paragraph C criteria because her mental impairments lasted at least two years, and she received treatment in a highly structured TLP resulting in diminished symptoms but achieving only "marginal adjustment." (R. 18, Pl.'s Br. at 10-11.) The key issue in this appeal, according to her, "centers on whether [she] met the marginal adjustment criterion"—and on this point, Cynthia asserts that there is "no evidence that she can adjust to life outside the TLP." (Id.) Cynthia points to her TLP case worker's testimony that Cynthia would be unable to shop for groceries without help. (Id.) But as the ALJ noted, the case worker's concerns centered on Cynthia's physical limitations, not mental limitations. (A.R. 25; see also R. 24, Govt.'s Mem. at 8 (citing A.R. 994 (noting Cynthia independently prepared menu plan and shopping list, selected items at grocery store within allotted time, and paid for groceries)).) Cynthia also relies on the opinions of her treating providers. Yet as explained below, the ALJ

gave those opinions "little" or "limited" weight because they were not supported by the medical evidence of record.

Cynthia next attempts to undermine the evidence relied on by the ALJ. For example, Cynthia complains that the ALJ's explanation as to why she entered the TLP—because she lost her home to foreclosure and a social worker suggested the TLP—was "false" and her support "flimsy." (R. 18, Pl.'s Br. at 13.) At the hearing Cynthia testified that after her mother died, she needed someone to care for her because she was having difficulty retaining information and was anxious about that limitation. (A.R. 54-55.) As the government points out, however, Cynthia offered no evidence that she entered the TLP because of mental health distress, other than one record noting that she suffered moderate depression after her mother died—and that record was followed by a string of negative depression screening results. (R. 24, Govt.'s Mem. at 7.) Furthermore, Cynthia's September 2016 psychiatric evaluation with Dr. Lee lists her "[c]hief complaint/[c]urrent psychiatric symptoms" as "45 [year old, white single female] who had been living alone in family home . . . became homeless when her home was foreclosed on after her mother's death in [March 2015]." (A.R. 608; see also id. at 610 (listing as diagnostic formulation: "45 [year old, white single female] with 15 [year] history of depression and anxiety referred to TLP by social worker . . . due to homeless[ness] after death of mother and foreclosure on parent's home where she was living").) As part of that evaluation, Dr. Lee conducted a mental status examination, finding normal attention, mood, speech, affect, orientation, thought process, thought content, and memory. (Id. at 609.) While

Dr. Lee ultimately recommended that Cynthia enter the TLP, (id. at 611), Cynthia does not establish that mental symptom exacerbation led to her TLP participation.

Cynthia also challenges the ALJ's "emphasis on the fact that [Cynthia was] 'preparing to transition'" out of the TLP because TLP staff follow up with clients and assist with setting up appointments. (R. 18, Pl.'s Br. at 13 (citing A.R. 80-81).) Cynthia notes that she was "already allowed to overstay the limit at the program . . . because she [was] not ready to transition." (Id.) Yet at the hearing Cynthia's case worker clarified that the TLP extended Cynthia's participation pending the outcome of her disability claim because it needed to understand whether Cynthia would receive income. (A.R. 75.) In short, because Cynthia did not submit evidence undermining the maximum progress her providers said she had made, she failed to satisfy her burden of demonstrating marginal adjustment. *See Victoria R.*, 2022 WL 3543231, at *11.

Cynthia nevertheless contends that the court must consider whether the ALJ made an impermissible "leap of logic" in finding that she was capable of living independently when, according to her, the medical evidence contradicts this inference. (R. 18, Pl.'s Br. at 11.) She argues that even if the ALJ supported her listings assessment with substantial evidence, remand still may be necessary if the ALJ did not adequately explain how Cynthia—a resident in a highly structured TLP that included group and individual therapy meetings, monthly psychiatric visits, and treatment with psychotropic medications—could sustain full-time competitive work. (See R. 26, Pl.'s Reply at 3-4.) In this regard, Cynthia attempts to tease out any

tension between the substantial evidence standard and the Seventh Circuit's logical bridge requirement. *See Jarnutowski*, 48 F.4th at 775-77 (finding that despite some evidence supporting ALJ's decision, reversal was required where ALJ "failed to build an accurate and logical bridge between the evidence and her conclusion").

But here, the ALJ examined the record and adequately explained why Cynthia did not satisfy the criteria required to meet or equal listings 12.04 or 12.06. While Cynthia contests in particular the ALJ's assessment of the paragraph C criteria, the ALJ properly "considered the important evidence, and [her] opinion enables [the court] to trace the path of the ALJ's reasoning." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). As discussed, the ALJ cited objective evidence—including contemporaneous notes from Cynthia's providers—to support her finding that Cynthia did not satisfy her burden of showing that she achieved marginal adjustment. (A.R. 23 (citing *id.* at 886-915 (demonstrating "maximum progress" in treatment, independent medication management, and success in gaining skills to manage symptoms and complete daily activities); *see also* 20 C.F.R. § 404, Subpt. P, App. 1, 12.03(C); *Daniel H. v. Kijakazi*, No. 20 CV 2597, 2021 WL 5370140, at *4 (S.D. Ind. Nov. 2021). Accordingly, Cynthia failed to demonstrate that she satisfies the listings criteria for a presumptive disability.

## B. Opinion Evidence

Cynthia next challenges the ALJ's evaluations of her treating psychiatrist, three treating therapists, and two treating nurse practitioners, arguing that the ALJ afforded their opinions little or limited weight without offering sound explanations

for doing so.  (R. 18, Pl.'s Br. at 13-14.)  Under the treating physician rule in effect at the time Cynthia filed her disability claim, an ALJ must give controlling weight to a treating physician's opinion if it is: "(1) supported by medical findings; and (2) consistent with substantial evidence in the record."[4]  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).  If the ALJ concludes that a treating physician's opinion is not entitled to controlling weight, she must give "good reasons" for discounting the opinion, after considering factors such as the nature of the treatment relationship, the frequency of examination, the physician's specialty, the type of tests performed, and the reliability of the opinion.  *See* 20 C.F.R. § 416.927(c); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016).

Here, the ALJ evaluated a host of treating source opinions, including a series of opinions from Cynthia's treating psychiatrist, Dr. Lee, who opined in 2016 and 2017 that Cynthia was unable to work because of panic attacks, spinal stenosis, extensive nerve damage, incontinence, IBS, frequent use of the bathroom, persistent depressive disorder, mood instability, and questionable social judgment.  (A.R. 31-33 (citing id. at 790-91, 793, 801-02, 804).)  The ALJ afforded little weight to these opinions, explaining that while Dr. Lee was "an acceptable medical source," his conclusions that Cynthia was not able to work were "not binding" on the SSA and were inconsistent with "the longitudinal evidence of record," including generally

---

[4]  The SSA has since adopted new rules for evaluating the opinions of treating physicians.  *See* 82 Fed. Reg. 58844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017). Because the new rules apply only to disability applications filed on or after March 27, 2017, they do not apply here.  (Id.)

unremarkable psychiatric evaluations showing stable mood and controlled IBS symptoms. (Id.)

Dr. Lee also submitted a December 2017 mental RFC[5] in which he opined that since 1993, Cynthia had experienced symptoms and limitations precluding her from being able to work. (Id. at 808.) He opined that these symptoms and limitations would cause Cynthia to be "off task" more than 30% of a workday, miss six days of work each month, and preclude her from working on a sustained basis without continuous supervision or undue interruptions. (Id. at 810.) The ALJ assigned limited weight to this mental RFC, finding the limitations inconsistent with Dr. Lee's own evaluations and the record evidence. (Id. at 33.) The ALJ indicated that Dr. Lee's opinions appear to be based in part on Cynthia's subjective reports because he started treating her in September 2016, and his mental RFC covered the time period from 1993 through 2017. (Id.) Furthermore, the ALJ noted Dr. Lee opined that Cynthia suffered medication side effects of constipation and fatigue, but the objective medical evidence did not note any side effects. (Id.) Finally, the ALJ determined that Dr. Lee's opinions were internally inconsistent—for example, Dr. Lee opined that Cynthia could carry out detailed instructions but could not understand or remember detailed instructions. (Id. (citing id. at 809).)

---

[5] Dr. Lee submitted another mental RFC in September 2018, opining that Cynthia would be unable to work because of symptoms related to depression, anxiety, neglect of critical functions, diminished ability to concentrate, impulsivity, and hypersensitivity. (A.R. 1330-33.)

As for Dr. Lee's opinions, Cynthia contends that the ALJ failed to consider the nature of Dr. Lee's relationship as her treating psychiatrist and to explain why his opinions were not binding or supported.  (R. 18, Pl.'s Br. at 14.)  Cynthia claims the ALJ erred by describing Dr. Lee as "an acceptable medical source,"[6] rather than as her "treating specialist."  (Id. (citing A.R. 31).)  But earlier in her decision, the ALJ referred to Dr. Lee as Cynthia's "treating provider[]" and "psychiatrist," (A.R. 21), and discussed his "psychiatric evaluations" of her, (id. at 23, 27, 31).  The ALJ also noted that Dr. Lee began treating Cynthia in 2016 and that he submitted opinions describing her symptoms and limitations from November 2016 through December 2017.  (Id. at 31-33 (citing id. at 808-11 (noting that Dr. Lee began treating Cynthia on September 1, 2016, and that he met with her once a month)).)  As such, the ALJ sufficiently considered the nature of Dr. Lee's treatment relationship with Cynthia.  *See Ray v. Saul*, 861 Fed. Appx. 102, 105-06 (7th Cir. 2021) (noting that court "will affirm the ALJ's decision if [it is] confident that the ALJ's reasoning sufficiently accounted for the substance of the prescribed factors").

Cynthia also challenges the ALJ's finding that Dr. Lee's opinions were not binding or supported.  She criticizes the ALJ's discounting of Dr. Lee's opinions that Cynthia was unable to work because such conclusions are reserved for the Commissioner.  (R. 18, Pl.'s Br. at 14 (citing A.R. 31).)  But "offering an opinion on

---

[6] The ALJ's description of Dr. Lee as "an acceptable medical source," (A.R. 31), is consistent with the applicable regulation governing opinion evidence for claims filed before March 27, 2017, 20 C.F.R. § 416.927 (defining "[m]edical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity" of impairments).

the ultimate issue—whether [the claimant] was disabled during the relevant period, [is] a question reserved for the Commissioner." *Ray*, 861 Fed. Appx. at 105. Regardless, the ALJ grappled with Dr. Lee's opinions, comparing them with his treatment records and the record evidence as a whole. (A.R. 23, 27-33.) Because the ALJ found that the longitudinal evidence did not "demonstrate severe symptomatology," and instead revealed "generally unremarkable" psychiatric evaluations, "stable" mood, and "controlled" IBS symptoms, she assigned little weight to Dr. Lee's opinions. (See id. at 23 (noting Dr. Lee's findings of "mild depression" in June 2018 but then "minimal or no symptoms" in July, August, and September 2018), 27 (noting Cynthia's reports to Dr. Lee of frequent crying but finding on examination normal attention, mood, speech, affect, thought processes, thought content, and memory), 28-29 (noting Dr. Lee's referral into TLP in September 2016 but then recording: in October 2016 normal concentration/attention, euthymic mood, appropriate and normal range of affect, good judgment and insight, appropriate grooming, and normal thought processes/content; in December 2016 unremarkable mental status examination, except for difficulty interpreting abstract expressions; in March, April, and May 2017 unremarkable mental status examinations with GAF scores between 51 and 55; in January, April, May, and July 2018 unremarkable mental status examination except for anxious and depressed mood that did not worsen and became stable), 30 (noting Dr. Lee's findings in September 2018 that Cynthia showed no signs of depression and that she was managing anxiety

24

symptoms).)  The ALJ supported her assessment of Dr. Lee's opinions with substantial evidence.

Cynthia next criticizes the ALJ's rejection of Dr. Lee's mental RFC on grounds that it was: (1) "contrary to the evidence"; (2) based on Cynthia's own reports; and (3) relied on an absence of "vegetative depressive symptoms."  (R. 18, Pl.'s Br. at 14.) Each of these arguments fails.  First, Cynthia cites no treatment records supporting her argument that the ALJ unfairly characterized the evidence.  (Id. (citing A.R. 32-33, ALJ's opinion evaluation).)  Second, the ALJ considered whether Cynthia's reports to Dr. Lee were supported by and consistent with the objective evidence in the record, as she was required to do.  (A.R. 33); *see also* 20 C.F.R. § 416.927(c)(3)-(4). The ALJ found they were not, explaining that while Cynthia's claimed symptoms date back to 1993, there were no treatment records until November 2016, and no medication side effects were indicated in the records.  (A.R. 33.)  Third, the ALJ supported her opinion evaluation in part based on Dr. Lee's own treatment records, which showed that Cynthia was "doing fairly well" despite the unexpected death of a friend and that she denied "any vegetative depressive symptoms," contrary to the extreme limitations Dr. Lee espoused.  (Id. (citing id. at 1009-12).)

Cynthia also argues that mental symptoms cannot be viewed by x-ray and, as such, Dr. Lee's observations should trump a lack of objective findings.  (R. 18, Pl.'s Br. at 14.)  But as discussed with respect to Dr. Lee's opinions, the ALJ cited substantial evidence, including contemporaneous observations from Dr. Lee's records, revealing mental evaluations that were unremarkable.  (A.R. 27-33.)  The

ALJ was permitted to grant less weight to Dr. Lee's mental RFC based on the objective medical evidence, including his own treatment records. *See Henke v. Astrue*, 498 Fed. Appx. 636, 646 (7th Cir. 2012) (upholding treating physician evaluation where "sweeping conclusions lacked support in [physician's] own treatment notes").

Cynthia next asserts that the ALJ improperly afforded only little weight to therapist Rachael Mathew's December 2017 opinion that Cynthia suffered marked social and attention limitations and would have a "very difficult" time sustaining work because of her IBS symptoms and anxiety. (R. 18, Pl.'s Br. at 14; A.R. 32 (citing id. at 812-13).) Mathew's opinion discusses how Cynthia's IBS symptoms exacerbate her anxiety. (A.R. 812-13 (noting that: "[c]lient struggles with IBS in addition to her psychiatric symptoms, which make it hard for her to be far away from a restroom"; "Cynthia's IBS symptoms are exacerbated by her anxiety and make[] it physically difficult for her to be away from a restroom"; [c]lient's IBS symptoms are always on her mind and cause extreme physical mental and emotional distress"; "[s]he finds it very difficult to relax or be at peace, unless she is always within a couple of steps away from a bathroom"; "[c]lient is often worried and concerned about her IBS symptoms, which increases her anxiety"; "[i]n my opinion, due to client's IBS symptoms and struggle with anxiety, it would be very difficult for her to work").)

The ALJ gave little weight to Mathew's opinion because the record did not "fully support" it. (Id. at 32.) Earlier in her decision, the ALJ explained that shortly before her disability onset date, Cynthia reported during a medical visit "occasional fecal and urinary incontinence." (Id. at 19-20 (citing id. at 760 (Oct. 2016 treatment

record)).)  A few weeks later, in late October 2016, Dr. Lee started Cynthia on Imodium.  (Id. at 20 (citing id. at 618, 719).)  In her November 2016 function report, and as the ALJ noted, Cynthia did not mention IBS issues.  (Id. (citing id. at 277); but see id. at 306 (Dec. 2016 function report alleging "incontinence (urine [and] fecal) due to spinal stenosis")).)  By December 2016 Cynthia reported to Dr. Lee that she had "less frequent anxiety about leaving the apartment and going out for fear of having a bowel accident in public since on Imodium 2 mg daily."  (Id. (citing id. at 723).)  Thereafter, Dr. Lee recorded on several occasions Cynthia's reports that her bowel symptoms had decreased.  (Id. (citing id. at 1009, 1110, 1201, 1234).)  The ALJ also noted that group records did not reflect absences by Cynthia for bathroom breaks.  (Id. at 29 (citing id. at 1098, 1103); but see id. at 76.)  Based on her review of the objective evidence, the ALJ concluded that Cynthia's IBS symptoms were controlled with medication by December 2016 and "less frequent" in January 2018.  (Id. (citing id. at 1009 (Jan. 2018 treatment record noting that "[b]owel symptoms continue to be less")).)  Because the ALJ found support lacking for Mathew's opinion, the ALJ rejected Mathew's assessment that Cynthia suffered marked restrictions and, as such, that she was unable to work.  (Id. at 32.)

Cynthia challenges the ALJ's evaluation to the extent it focused on Cynthia's IBS symptoms, rather than on the panic attacks that would ensue from such issues. (R. 18, Pl.'s Br. at 14.)  Yet as explained, the ALJ discussed Cynthia's "anxiety/fear of having bowel accidents" earlier in her decision, and cited Cynthia's report to Dr. Lee that, after starting Imodium, she had "less frequent" anxiety and fear.  (A.R. 20

(citing id. at 723).)  This is not a case of the ALJ ignoring evidence.  Rather, the ALJ reviewed and weighed the evidence, and supported her opinion evaluation with substantial evidence.  Where, as here, "the decision is adequately supported," *Elder*, 529 F.3d at 413, the court cannot reweigh that evidence or substitute its judgment for that of the ALJ's, *Deborah M.*, 994 F.3d at 788.  This is true, "even if reasonable minds could differ concerning whether [the claimant] is disabled."  *Jarnutowski*, 48 F.4th at 773 (citing *Elder*, 529 F.3d at 413); *see also Hahn*, 2022 WL 6628832, at *3.

Finally, insofar as Cynthia generally asserts that the ALJ "inexplicably discounted" other opinions, including from other therapists and nurse practitioners, (R. 18, Pl.'s Br. at 13), she did not develop this argument and therefore forfeits it, *see John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 614 (7th Cir. 2021) ("A party who does not sufficiently develop an issue or argument forfeits it.").

## C.    RFC Assessment

Cynthia argues that the ALJ erred by not accounting for her non-exertional limitations—specifically, her CPP limitations—in assessing her RFC.  (R. 18, Pl.'s Br. at 15-16.)  The RFC measures the maximum a person can do despite her limitations and must be based on "all the relevant evidence" in the record.  20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).  In assessing a claimant's RFC, the ALJ "must give substantial weight to the medical evidence and opinions submitted, unless specific, legitimate reasons constituting good cause are shown for rejecting it."  *Chambers v. Saul*, 861 Fed. Appx. 95, 101 (7th Cir. 2021) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995) (quotations

omitted)).  Nevertheless, a flawed RFC assessment will not justify remand unless the claimant can identify additional limitations not already included in the RFC. *See Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021); *Jozefyk*, 923 F.3d at 498.

Here, the ALJ determined that Cynthia suffers from non-exertional limitations and accounted for limitations supported by the record.  *See Cervantes v. Kijakazi*, No. 20-3334, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021).  At step three the ALJ evaluated the paragraph B evidence and determined that Cynthia suffers moderate deficits in three functional areas, including CPP.  (A.R. 30.)  The ALJ provided substantial evidence to support that assessment, as explained.  (See, e.g., A.R. 22 (citing id. at 613, 617, 714, 720, 732, 736, 740, 1111, 1202, 1273, 1313 (recording normal attention and concentration), id. at 684, 695, 901-02, 1034 (reporting appropriate social interactions in groups, good relationships with siblings and neighbor, and "communicative" nature with staff and peers)).)

Taking these deficits into account, the ALJ formulated an RFC including the following non-exertional limitations: Cynthia "can understand, remember and carry out no more than simple, routine work tasks" and perform "the same tasks day in and day out without strict quotas."  (Id.)  With respect to her restrictions in interacting with others, the ALJ limited Cynthia to performing work with no public contact and only occasional contact with coworkers or supervisors.  (Id.)  Cynthia argues that her TLP participation shows she cannot perform basic work functions and that her providers' medical opinions support this conclusion.  (R. 18, Pl.'s Br. at 15.)  But as explained, the ALJ addressed Cynthia's TLP participation and found that while it

justified the inclusion of certain non-exertional limitations in Cynthia's RFC, it did not preclude all work. (See A.R. 20-33.) Also as explained, the ALJ considered the opinion evidence and adequately supported her decision to discount such evidence. (See id. at 30-33.) Where, as here, the ALJ supported her RFC with substantial evidence, the court affirms that finding. *See Pepper*, 712 F.3d at 363.

## Conclusion

For the foregoing reasons, Cynthia's motion for summary judgment is denied, and the government's is granted.

ENTER:

_____
**Young B. Kim**
**United States Magistrate Judge**